# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

NORMAN B. CALVERT,

|  |  |  |
|---|---|---|
| | Plaintiff, | No. 02-CV-6194 CJS |
| -vs- | | |
| | | DECISION AND ORDER |
| THE STATE OF NEW YORK, et al., | | |
| | Defendants. | |

_____

### APPEARANCES

For Plaintiff:        J. Michael Wood, Esq.
Chamberlain D'Amanda
Oppenheimer & Greenfield LLP
Two State Street, 1600 Crossroads Building
Rochester, New York 14614-1397

For Defendants:      Benjamin A. Bruce, Esq.
New York State Attorney General's Office
Department of Law
144 Exchange Boulevard
Rochester, New York 14614

### INTRODUCTION

This is an action, pursuant to, *inter alia*, 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans With Disabilities Act, 42 U.S.C. § 12132, brought by plaintiff Norman Calvert ("Plaintiff"), a prison inmate in the custody of the New York State Department of Correctional Services ("DOCS"), against the State of New York and various DOCS employees in their official and individual capacities, seeking money damages and injunctive relief. Now before the Court are two applications by Defendants: 1) a motion to amend their answers to include the affirmative defense of failure to exhaust administrative remedies; and 2) a

motion for partial summary judgment. For the reasons that follow, the motion to amend is denied and the motion for partial summary judgment is granted in part and denied in part.

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case, viewed in the light most favorable to Plaintiff. Plaintiff has been in DOCS' custody since 1997. In or about 2001 Plaintiff was transferred to Collins Correctional Facility ("Collins"), a medium security prison. Upon his arrival at Collins, Plaintiff told the medical staff that he had a psychiatric disability which prevented him from attending prison "educational programs," which, he maintains, are nothing more than "jobs." (Amended Complaint ¶ 5) ("All programs in DOCS are per se jobs, as that term is defined by the Rehabilitation Act . . . [and ADA]."); *see also, Id*. at ¶ 17 (Stating that programs are jobs); *see also*, ¶ ¶ 41-43. In other words, Plaintiff stated that he was unable to work, or to participate in any prison program which he viewed as involving work. Subsequently, defendant Elaine Thorndahl ("Thorndahl"), a psychologist with the New York Office of Mental Health ("OMH"), denied Plaintiff's request to be excused from attending programs, and denied his request to see a psychiatrist.

On or about November 1, 2001, Plaintiff wrote to defendant Richard Becker ("Becker"), the Deputy Superintendent for Programs at Collins, claiming that he was entitled to protection under the ADA. Plaintiff stated that he had been granted Social Security Disability Insurance ("SSDI") benefits in 1987 "for psychiatric reasons." (Calvert Affidavit, Exhibit C). Plaintiff also stated that he was pursuing a psychiatric disability claim with the Veteran's Administration ("VA"), which had been pending since 1986. *Id*.

On November 6, 2001, Becker responded, and asked Plaintiff to identify the disability that he was claiming and the special accommodations that he would need in order to participate in programs. *Id*. On November 6, 2001, Plaintiff responded that he was claiming a "service connected 100% psychiatric disability," and that it would be "inappropriate to consider <u>ANY MANNER</u> of working arrangements to accommodate this sort of disability, as such does not exist." *Id*. (Emphasis in original). Plaintiff further stated:

> However, in the event that it is mandatory that I participate in programs while I am at this facility, may I suggest that you consider that I was participating in the General Business program while I was in Attica, and I can not imagine any reason why this would complicate matters related to the obtaining of my Disability Benefits upon my release from state custody; and there is the possibility that this training could provide me with the wherewithal to be a productive member of society, within the confines of restrictions of my Psychiatric Disability.

*Id*. On November 7, 2001, Becker responded that Plaintiff's request did not appear to involve reasonable accommodation under the ADA, but rather, involved appropriate programming. In that regard, Becker advised Plaintiff that he would be interviewed by the Program Committee.

The Program Committee assigned Plaintiff to the Appliance Repair educational program. On November 19, 2001, Plaintiff reported to the Appliance Repair classroom, whereupon, he states:

> Almost immediately upon my arrival at the Appliance Repair "classroom" . . . I felt upset, stressed out; apparently the result of my Psychiatric Disability rearing its ugly head. I felt that I might 'do something' which would complicate and extend my present sentence, and I informed the instructor that I wouldn't be returning. He suggested that I go on Emergency Sick Call and see the OMH . . . which I did, but to no avail.

(Amended Complaint ¶ 18).

The following day a corrections officer directed Plaintiff to return to the Appliance Repair program, to which Plaintiff responded that he was entitled to "reasonable accommodation" under the ADA. (Amended Complaint ¶ 19). The corrections officer issued Plaintiff a Tier II misbehavior report for refusing a direct order. On November 26, 2001, defendant Corrections Lieutenant Matthew Whitmore ("Whitmore") conducted a disciplinary hearing. Plaintiff attempted to introduce documents concerning his Social Security disability status, and Whitmore responded, "I'm not interested in that stuff, it's irrelevant." Id. ¶ 26. Whitmore concluded that Plaintiff's claim of disability was "not valid," after which he found Plaintiff guilty and sentenced him to thirty days in the Special Housing Unit ("SHU"). *Id*. ¶ 21.

Plaintiff apparently appealed to defendant James Berbary ("Berbary"), the Superintendent at Collins, who referred the matter to defendant Sibatu Kahaifa ("Kahaifa"), Deputy Superintendent for Security at Collins. Kahaifa affirmed the conviction.[1] Plaintiff then attempted to appeal to DOCS Comissioner Glenn S. Goord ("Goord"). However, on December 10, 2001, Lucien J. Leclaire, Jr. ("LeClaire"), Deputy Commissioner for DOCS, informed Plaintiff that Goord did not review appeals from Tier II disciplinary hearings, and that the final appeal for such disciplinary hearings was to the "facility Superintendent or designee," who, in this case, was Kahaifa. (Calvert Aff. Ex. E).

On January 10, 2002, fifteen days after he was released from SHU, Plaintiff

---

[1]The Amended Complaint indicates that Kahaifa denied Plaintiff's appeals, finding "no procedural errors." (Amended Complaint ¶ 31). The record indicates that Kahifa denied the first and third appeals, and that Captain Wise, who is not a defendant, denied the second appeal. (Calvert Aff. Exhibit A, Exhibits to Amended Complaint).

again refused to attend programming, and another corrections officer issued Plaintiff a second Tier II misbehavior report for refusing a direct order. Plaintiff was again found guilty at a Tier II disciplinary hearing, and was sentenced to thirty more days in SHU. During that thirty-day period in SHU, Plaintiff, in protest, elected not to eat. *Id*. ¶ 23.

On March 7, 2002, one month after being released from SHU, Plaintiff again declined to attend programming, and was again issued a misbehavior report. *Id*. ¶ 24. Plaintiff was apparently found guilty and again sentenced to thirty days in SHU.

Plaintiff alleges that "DOCS" was aware that he had a "back ailment." (Amended Complaint ¶ 47). Plaintiff further contends that, in SHU, his bed was "harder than woodpecker lips," which caused "excruciating pain to [his] back." *Id*. ¶ 48. Plaintiff further states that when he was released from SHU, he was assigned to a bed that was "specially hard" and "normally reserved for inmates with a 'back' permit." *Id*. ¶ 49.

At some point in or about this period, Plaintiff commenced an Article 78 proceeding against unspecified DOCS officials in New York State Supreme Court. *Id*. ¶ 55.

The Amended Complaint alleges that, shortly after Plaintiff was released from SHU, defendant Corrections Sergeant Albert Wilkins ("Wilkins") ordered him to "get rid of some of [his] legal paperwork." *Id*. ¶ 50. Plaintiff states that his eyesight was poor as a result of fasting in the SHU, and that consequently, he "had difficulty distinguishing between [his] papers, and inadvertently discarded some very important legal papers." *Id*. ¶ 51. However, in his affidavit submitted in opposition to Defendants' summary judgment motion, Plaintiff now states that it was defendant Corrections Officer Debbie

Morrison ("Morrison") who ordered him to get rid of the papers. (Calvert Affidavit ¶ 14).

Also shortly after being released from SHU, Morrison ordered Plaintiff to remove a braid from his hair. According to Plaintiff, "my hair is Holy and Spiritual to me." *Id*. ¶ 52.

On March 12, 2002, while Plaintiff was in SHU, defendant Corrections Sergeant Daniel Grant ("Grant") entered his cell and confiscated Plaintiff's "letterhead." *Id*. ¶ 53.[2] Plaintiff states that Grant also "threatened to have [him] injected with Psychotropic Medications, to mentally incapacitate [him]." *Id*. ¶ ¶ 53-54.

On April 4, 2002, Corrections Officer Hessler ("Hessler"), who is not a defendant in this action, told Plaintiff that if he continued to refuse to report to program, he would issue Plaintiff a Tier III misbehavior report, that could result in Plaintiff receiving at least sixty days in the SHU. *Id*. ¶ 58.

Sometime later in 2002, apparently, Plaintiff was transferred to Clinton Correctional Facility ("Clinton"), a maximum security prison. (Amended Complaint ¶ 60). In that regard, Plaintiff states, "Since the filing of this Complaint," apparently referring either to his Article 78 proceeding or this proceeding, "I have had my security classification increased so that I am now rated as Maximum Security, which means that I have been sent to nothing but Maximum Security prisons." *Id*. ¶ 59. Plaintiff further contends that while confined at Clinton, for a period of at least three years, he was "placed on Limited Privilege Status, which means, <u>inter alia</u>, that [he was] almost on

---

[2]Plaintiff has sent the Court numerous letters on letterhead that is presumably the same aforementioned letterhead, which contains his name and address, various images of the U.S. flag, and a saying, "You are **NOT** what you think you are; but, what you **THINK**, <u>you</u> **ARE**. **MIND YOUR MIND**!!!." (Emphasis in original).

24/7 lockdown." *Id*. ¶ 60.  Further, although the Amended Complaint does not contain

such an allegation, Plaintiff states in his affidavit that, "due to [his] refusal to participate

in DOCS programs," he has also lost good-time credit off his sentence. (Calvert Aff. ¶

17).  Plaintiff does not identify the person or persons who are allegedly responsible for

the change in his security classification.

On April 10, 2002, Plaintiff, proceeding *pro se*, commenced this action.  On

December 9, 2002, the Court dismissed the action for failure to state a claim. (Docket

No. [#5]).  Plaintiff appealed, and on June 8, 2005, the Second Circuit affirmed in part,

vacated in part, and remanded the case to this Court.  In that regard, the Second Circuit

affirmed the dismissal of the claims against the State of New York, and the claims for

money damages against the individual defendants in their official capacities, and

otherwise vacated and remanded, with directions that Plaintiff be allowed to amend his

complaint. (Second Circuit's Mandate, Docket No. [#10]).

On February 27, 2003, the U.S. Veterans' Administration granted Plaintiff a

100% Psychiatric Disability rating, retroactive to 1986.

On November 30, 2005, Plaintiff, proceeding *pro se*, filed the subject Amended

Complaint (Docket No. [#12]).  The first cause of action alleges that Becker, Whitmore,

Thorndahl, Berbary, defendant Dr. Yeung Oh ("Oh"), a psychiatrist at Clinton, defendant

Gayle Hanley ("Hanley"), an employee of OMH, defendant Susan Kickbush

("Kickbush"), and defendant Ms. Kinsey ("Kinsey"), acted in concert to deprive Plaintiff

of his constitutional rights and his rights under the ADA and the Rehabilitation Act.  The

Court observes, however, that the Amended Complaint contains no factual allegations

concerning Berbary, Oh[3], Hanley, Kickbush, or Kinsey.

The second cause of action alleges that Berbary, Kahaifa, Becker, Oh, Whitmore, Thordahl, Hanley, Kickbush, Kinsey, Wilkins, and Grant, along with defendants Glen Goord ("Goord"), the former Commissioner of DOCS, and defendant Lester Wright ("Wright"), the Chief Medical Officer for DOCS, conspired to violate Plaintiff's rights under "Pub. L. 102-256 § 2(a)(1) -the Torture Victim Protection Act of 1991," the U.S. Constitution, the ADA, and the Rehabilitation Act. With regard to the constitutional claims, Plaintiff alleges that Defendants violated his rights under the Eighth Amendment (cruel and unusual punishment and deliberate indifference to serious medical needs) and the Fourteenth Amendment (due process and equal protection). (Amended Complaint at pp. 17-18). Again, however, the Amended Complaint contains no factual allegations concerning Goord, Wright, Berbary, Oh, Hanley, Kickbush, or Kinsey.

Liberally construing the Amended Complaint, it also appears that Plaintiff is alleging a third cause of action, for retaliation, under the First Amendment. In that regard, Plaintiff maintains that the actions by Wilkins, Morrison, and Grant, in ordering him to get rid of some of his papers, ordering him to remove a braid from his hair, confiscating his letterhead, and in threatening to have him injected with psychotropic medications, show a conspiracy to retaliate against him for commencing his Article 78 proceeding. (Amended Complaint ¶ 55). Plaintiff also appears to allege retaliation in

---

[3]The Amended Complaint indicates that upon his arrival at Collins, Plaintiff spoke with an unnamed "medical doctor." (Amended Complaint ¶ 6). However, it does not appear that this doctor was Dr. Oh, since Plaintiff indicates that he was not permitted to see a psychiatrist. *Id*. ¶ 10.

connection with his bed assignment and the change in his security classification.

Defendants answered the Amended Complaint, and asserted various affirmative defenses, but did not assert the affirmative defense of failure to exhaust administrative remedies.

On June 6, 2006, the Honorable Jonathan W. Feldman, United States Magistrate Judge, appointed counsel to represent Plaintiff. (Docket No. [#43]). On the same date, Judge Feldman issued a Final Scheduling Order (Docket No. [#45]), which, *inter alia*, directed that all motions to amend pleadings be filed by September 4, 2007, that all factual discovery be completed by November 30, 2007, and that all dispositive motions be filed by January 11, 2008. The order further stated, "No extension of the above cutoff dates will be granted except upon written application, made prior to the cutoff date, showing good cause for the extension." (Emphasis in original).

On January 10, 2008, one day prior to the deadline for filing dispositive motions, Defendants filed a motion for an extension of that deadline. (Docket No. [#48]). Defendants did not request an extension of any other deadlines in the Final Scheduling Order, and in any event, those deadlines had long since passed. Nevertheless, Defendants requested to have until March 11, 2008, to file a dispositive motion. In support of the request, Defendants' counsel stated, in relevant part:

> Defendants require additional time to depose the plaintiff[4] and obtain affidavits needed to support their intended summary judgment motion. I have contacted the attorneys for plaintiff and they do not oppose a sixty (60) day extension to the scheduling order to permit dispositive motions to be filed by March 11, 2008.

---

[4]It is unclear whether Defendants ever deposed Plaintiff. There is no mention of such a deposition in Defendants' summary judgment motion.

(Bruce Affirmation [#49], ¶ ¶ 3-4).  From this, the Court observes that the stated reason for needing an extension of the deadline for filing dispositive motions was that Defendants had not complied with the deadline for completing discovery.  In any event, despite receiving no response from the Court, Defendants did not file a dispositive motion by the January 11th deadline.

On March 11, 2008, Defendants filed the subject motions.  First, Defendants filed a motion to amend their answers, to assert the affirmative defense of failure to exhaust administrative remedies. (Docket No. [#50]).  In support of the application, Defendants' counsel stated that the amendment would not prejudice Plaintiff, that the amendment would not necessitate additional discovery, and that amendment would serve the "interests of judicial economy," because it "could lead to the disposition of the matter." (Defendants' Memo of Law [#51] at 1-2).  The application did not attempt to offer good cause for failing to comply with the deadline for filing motions to amend pleadings.

Second, Defendants filed the subject motion for summary judgment. (Docket No. [#52]).  Defendants contend that all of Plaintiff's claims should be dismissed pursuant to 42 U.S.C. § 1997e(a), since Plaintiff did not exhaust his remedies under the DOCS grievance program.  In that regard, Defendants have submitted proof that Plaintiff never appealed any inmate grievance concerning the subject-matter of this action to DOCS' Central Officer Review Committee ("CORC").  Defendants also maintain that Plaintiff cannot demonstrate a prima facie case under the ADA, since he has not indicated "why his disability prevents him from performing any activity that could be considered work and simply differs with DOCS over the type of program in which he should participate." (Def. Memo of Law [#53] at 8).  Defendants also state that the ADA claims should be

dismissed against the individual Defendants, since individuals are not liable under the ADA. Defendants further contend that they are entitled to summary judgment on the Eighth Amendment claims, since "Plaintiff's claims concerning the lack of medical services, his hard mattress, the loss of legal papers and blank letterhead, the change of his security status and retaliation do not rise to the level of Eight[h] Amendment violations." *Id*. at 9. Further, Goord, Wright, and Berbary argue that the Section 1983 claims should be dismissed against them, since there are no allegations of personal involvement against them in the Amended Complaint. *Id*. at 10. And finally, Defendants contend that they are entitled to qualified immunity, since their "actions were objectively reasonable under the circumstances." *Id*. at 11.

On October 15, 2008, Plaintiff filed responsive papers. In response to Defendants' motion to amend, Plaintiff contends that the motion should be denied as untimely. Additionally, Plaintiff states that the amendment would be futile, since Plaintiff believed that it was unnecessary to proceed further with the inmate grievance process after his claim became the subject of disciplinary proceedings.

In response to Defendants' summary judgment motion, Plaintiff states that he has stated a prima facie case under the ADA. Plaintiff further maintains that he has stated an Eighth Amendment claim, since the penalties imposed on him were disproportionately harsh, with the penalties consisting of: 1) three thirty-day SHU sentences; 2) a hard bed; 3) being ordered to get rid of some papers; 4) having letterhead confiscated from his SHU cell; and 5) being threatened with injection of psychotropic medication. As for the claims against Goord, Wright, and Berbary, Plaintiff insists that he has shown personal involvement.

Defendants were granted until January 9, 2009, to file reply papers, but did not do so.

DISCUSSION

## Motion to Amend Answers

At the outset, Defendants' motion to amend is denied, since it was made beyond the deadline for filing such motions. Additionally, Defendants did not request the extension prior to the deadline, and have not shown good cause for the extension. Accordingly, the motion to amend is denied, and the Court need not consider the portion of Defendants' summary judgment motion alleging a failure to exhaust administrative remedies, since that defense is waived. *See, Mendez v. Barlow*, No. 04-CV-1030S(F), 2008 WL 2039499 (W.D.N.Y. May 12, 2008) (Discussing waiver of § 1997e(a) defense).

## Motion for Summary Judgment

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof

at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, Fed. R. Civ. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e).

At the outset, the Court will consider Defendants' summary judgment motion, even though it was filed late. In that regard, the summary judgment motion differs from

the motion to amend in two respects: First, the request to extend the summary judgment filing date was made prior to the expiration of the deadline, and second, Plaintiff consented to the extension.  Accordingly, even though it was ill-advised for Defendants to proceed as they did, the Court will consider the motion.

### *Plaintiff's ADA* Claim

Defendants contend that they are entitled to summary judgment on the ADA claim, because Plaintiff cannot establish a prima facie case.  The relevant heading in Defendants' memo of law mentions only the ADA, and not Section 504. *See*, Def. Summary Judgment Memo of Law at 7 ("Plaintiff Has Failed to State a Prima Facie ADA Claim Therefore the Complaint Should Be Dismissed.").[5]  Moreover, Plaintiff apparently construed Defendants' motion as dealing only with the ADA claim. Accordingly, the Court restricts its analysis to the ADA claim.

The general legal principles applicable to ADA claims are well settled:

> [T]he ADA [is] applicable to inmates in state prisons.  In order to state a claim under the ADA, a prisoner must establish that: (1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity that provides the service, program, or activity is a public entity.

*Allah v. Goord*, 405 F.Supp.2d 265, 274-275 (S.D.N.Y. 2005) (citations and internal quotation marks omitted).

Defendants contend that Plaintiff cannot demonstrate an ADA claim for the following reasons:

> [P]laintiff fails to indicate why his disability prevents him from performing

---

[5]Although, in the body of the discussion Defendants mention Section 504.

any activity that could be considered work and simply differs with DOCS over the type of program in which he should participate. He would be willing to participate in a General Business program but not an "Appliance Repair."

(Defendants' Summary Judgment Memo at 8). Defendants are correct that Plaintiff's letter to Becker on November 6, 2001, indicated that he was able to participate in a General Business program, as he had done previously at Attica. However, the relevance of that fact is unclear, since officials at Collins did not place Plaintiff in a General Business program, but instead, placed him in an Appliance Repair program. Plaintiff states that his psychiatric disability prevented him from working in that program, and Defendants have not provided any evidence to the contrary. Consequently, Defendants' motion for summary judgment on this ground is denied.

The individual Defendants further contend that they are entitled to summary judgment on the ADA claim, because "[i]ndividuals are not subject to the provisions of the ADA." (Defs. Summary Judgment Memo at 9). Although the distinction is important, Defendants do not differentiate between the claims against them in their individual capacities and those against them in the official capacities, or between the claims for money damages and those seeking injunctive relief.

It is clear that persons cannot be sued in their individual capacities under the ADA. *See, Cole v. Goord*, No. 05 Civ. 2902 (GEL), 2009 WL 2601369 at *3 (S.D.N.Y. Aug. 25, 2009) ("[I]t is well established that Title II does not authorize suits against state officers in their individual capacities.") (citations omitted). However, persons can be sued in their official capacities under the ADA for injunctive relief. *Cole v. Goord*, 2009 WL 2601369 at *3 ("Cole can proceed with a suit against the defendants in their official

capacity for injunctive relief pursuant to *Ex parte Young*, 209 U.S. 123, 155-56 (1908).")

(citation omitted).[6] As for claims for money damages against individual defendants in

their official capacities, the answer is less clear. *See, Id.* at *4 ("Less amenable to a tidy

answer is the issue of whether a plaintiff may sue a state officer in his or her official

capacity for money damages."). Some courts in this Circuit have held that such claims

can be maintained, while others had held that they cannot. *Id.* at *4-5 (collecting cases).

Here, the Court need not decide this issue, since this aspect of Defendants'

motion is unopposed. Accordingly, Defendants' motion to dismiss the ADA claims

against the individual Defendants is granted.

### Section 1983 -Personal Involvement

Goord, Wright, and Berbary contend that they are entitled to summary judgment

on the Section 1983 claims, since they were not personally involved in any of the alleged

constitutional violations. On this point, Defendants have not differentiated between the

claims seeking money damages and those seeking injunctive relief.

The general legal principles applicable to claims under 42 U.S.C. § 1983 are well

settled:

> In order to establish individual liability under § 1983, a plaintiff must show
> (a) that the defendant is a "person" acting "under the color of state law,"
> and (b) that the defendant caused the plaintiff to be deprived of a federal
> right. See, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492
> (1961). Additionally, "[i]n this Circuit personal involvement of defendants in
> alleged constitutional deprivations is a prerequisite to an award of damages
> under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).
>                                         ***

---

[6]The Court notes, however, that the claims for injunctive relief against Defendants who were
employed at Collins are now moot, since Plaintiff is no longer housed there. *See, Id.* ("[I]t is settled in this
Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring
facility.") (citations omitted).

An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004). However, personal involvement is not required where a state official is sued in his official capacity for injunctive relief. *See, Davidson v. Scully*, 148 F.Supp.2d 249, 254 (S.D.N.Y. 2001) ("[P]ersonal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under 42 U.S.C. § 1983.") (citation omitted). Instead, "[a]ctions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." *Id*. (Citations omitted).

In this case, as to the claims for money damages, the Court agrees that Plaintiff has not come forward with evidence of personal involvement by Goord, Wright, or Berbary. In that regard, Plaintiff states that Goord was personally involved, since he delegated the handling of Plaintiff's disciplinary appeal to Leclaire. However, Goord was not personally involved in the appeal, and, as Leclaire stated, Plaintiff had no right or ability to appeal his Tier II conviction to Goord in any event. Similarly, Plaintiff maintains that Wright was personally involved, since his subordinates "refused to grant" Plaintiff's

requests to be excused from work. However, without more, Wright is not personally liable for the acts of his subordinates. Finally, Plaintiff suggests that Berbary was personally involved because his designees denied Plaintiff's appeals from his Tier II disciplinary convictions. There is no indication, though, that Berbary himself was involved in those determinations. Instead, the record indicates that Kahaifa and Wise denied Plaintiff's appeals. Accordingly, Goord, Wright and Berbary are entitled to summary judgment on the claims against them for money damages.

As indicated above, personal involvement is not required as to the claims against these three Defendants in their official capacities for injunctive relief. Since Plaintiff is no longer housed at Collins, the claim for injunctive relief against Berbary is moot. However, his Section 1983 claims for injunctive relief against Goord and Wright can proceed.

### *Section 1983- Eighth Amendment*

Defendants argue that "Plaintiff's claims concerning the lack of medical services, his hard mattress, the loss of legal papers and blank letterhead, the change of his security status and retaliation do not rise to the level of Eight[h] Amendment violations." (Defendants' Summary Judgment Memo at 9).[7] Plaintiff responds that the Eighth Amendment violation consisted of the following: 1) the SHU sentences; 2) the hard bed; 3) the order to dispose of legal papers; 4) the confiscation of letterhead; 5) the threat to inject Plaintiff with psychotropic medication; 6) the change in Plaintiff's security classification; and 7) the loss of good time credit. As mentioned above, the loss of good time credit is not part of this action. The Court will proceed to consider the other incidents

---

[7]Plaintiff's retaliation claim falls under the First Amendment, not Eighth. In that regard, as mentioned above, the Court reads the Amended Complaint to state a First Amendment retaliation claim involving the bed, legal papers, letterhead, threat to inject medication, and change of security status.

upon which Plaintiff relies.

First, the thirty-day SHU sentences, imposed after Plaintiff was found guilty on three separate occasions of refusing a direct order, did not violate the Eighth Amendment. In that regard, "[r]estraints on an inmate do not violate the amendment unless they are totally without penological justification, grossly disproportionate, or involve the unnecessary and wanton infliction of pain." *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998) (citations omitted). The SHU sentences at issue here do not rise to that level. *See, Id.* (Six-month SHU sentence imposed on inmate with disminished mental capacities who made sexually threatening comment to civilian volunteer did not violate Eighth Amendment.).

Similarly, Grant's alleged verbal threat to have Plaintiff injected with medication does not rise to the level of a constitutional violation. *See, e.g., Green v. City of New York Dept. Of Corrections*, No. 06 Civ. 4978(LTS)(KNF), 2008 WL 2485402 at *6 (S.D.N.Y. Jun. 19, 2008) (collecting cases holding that mere verbal threats do not violate Eighth Amendment). In that regard, Grant was not a medical provider, and there is no indication that he had any ability to carry out such a threat.

Moreover, Plaintiff's claim concerning the change of his security classification from medium to maximum, without more, also fails to state a constitutional violation. *See, Justice v. Coughlin*, 941 F.Supp. 1312, 1326 (N.D.N.Y. 1996) ("[Plaintiff] has not put forth any factual allegations demonstrating that conditions in the maximum security prison to which he was transferred constituted cruel and unusual treatment. . . . [A]bsent allegations that conditions at the second institution constituted cruel and unusual punishment, [plaintiff] cannot prove that his transfer violated the Constitution.")

(Abrogated on other grounds). Plaintiff has not alleged or shown that such change in classification violated any statute, regulation, or rule. *See, McBride v. Hallenbeck*, 587 F.Supp. 490, 491 (S.D.N.Y. 1984) ("Mere transfer to an institution with more disagreeable conditions is not a sufficient basis for a constitutional claim.") (Noting that New York Corrections Law § 23 grants DOCS Commissioner the authority to transfer inmates).[8]

The alleged confiscation of Plaintiff's papers and letterhead also fails to state an Eighth Amendment claim. *See, Jones v. Furman*, No. 02-CV-939F, 2007 WL 894218 at *12 (W.D.N.Y. Mar. 21, 2007) ("[E]ven intentional, unauthorized deprivations of property by prison officials are not redressable pursuant to 42 U.S.C. § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). In New York, several adequate post-deprivation remedies are available such that even if Defendants either negligently or intentionally failed to provide Plaintiff with his personal property, no claim for relief under § 1983 lies.").

Defendants further state that Plaintiff's claim concerning his "hard mattress" does "not rise to the level of [an] Eighth Amendment violation[.]." (Defendants' Summary Judgment Memo at 9). In that regard, Defendants state that, "[b]efore pain of a constitutional magnitude can be said to exist, there must be evidence of a serious medical and emotional deterioration attributable to the challenged condition." *Id*. at 8 (citation omitted). Defendants further state that a defendant "must act with a sufficiently culpable state of mind." *Id*. Plaintiff counters, in his affidavit: "The beds in solitary confinement are extremely hard and exacerbated my back condition, which was known to

---

[8]Although Defendant did not move on this ground, it does not appear that Plaintiff has pleaded that any defendant in this lawsuit was personally involved in the change in his security classification.

officials at Collins Correctional Facility. Moreover, following my release from solitary confinement, I was assigned to an extremely hard bed, normally reserved for inmates with a back permit." (Calvert Affidavit ¶ 13). Plaintiff, though, does not identify the nature of his "back condition," nor does he identify the "officials" to whom he allegedly complained. At most, Plaintiff's complaint states that, "I had been complaining extensively at Sick Call, that the hard beds there were causing excruciating pain to my back." (Amended Complaint ¶ 48).

Defendants' cursory argument concerning the bed claim focuses on two points: The severity of Plaintiff's pain and Defendants' state of mind. With regard to the first point, an Eighth Amendment medical claim "contemplates a condition of urgency, one that may produce death, degeneration or extreme pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (*quoting Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)). Here, Plaintiff states that the bed caused him "excruciating pain," which is sufficient to state a claim.

As for Defendants' state of mind, Plaintiff must show that they acted with "deliberate indifference," meaning that they knew of and disregarded an excessive risk to his health or safety. *Hathaway v. Coughlin*, 37 F.3d at 66. However, as to this requirement, Plaintiff has not alleged that any defendant in this action was aware of his back problem, or was directly involved in the assignment of his bed. Instead, Plaintiff merely alleges that "DOCS" or unnamed "officials" were "apprised" of his back ailment, and that he "was assigned" a hard bed. (Amended Complaint ¶ ¶ 47-49). Consequently, Plaintiff has not raised a triable issue of fact as to whether any Defendant acted with deliberate indifference, and his Eighth Amendment bed claim must be dismissed.

Defendants also contend that they are entitled to summary judgment based on qualified immunity.  In support of their argument, they state only as follows: "The defendants' actions were objectively reasonable under the circumstances and therefore they are entitled to qualified immunity and the complaint should be dismissed." (Def. Summary Judgment Memo at 11).  This conclusory single statement does not establish the absence of any genuine issue of fact or Defendants' entitlement to judgment as a matter of law.  The motion based on qualified immunity is therefore denied.

_Security Classification Claim and Claims against Oh, Hanley, Kickbush, Kinsey, and Wilkins_

Although Defendants' counsel has not raised the issue, the Court notes that the Amended Complaint does not contain any factual allegations against Oh, Hanley, Kickbush, or Kinsey.  Additionally, as mentioned above, although the Amended Complaint contains a single factual allegation concerning Wilkins (Amended Complaint ¶ 50), Plaintiff now states, in his affidavit submitted in opposition to summary judgment, that it was Morrison, not  Wilkins, who ordered him to get rid of legal papers. Accordingly, there also does not appear to be any factual basis for a claim against Wilkins.  Nor does the Amended Complaint contain any factual allegation linking any Defendant to the change in his security classification from Medium to Maximum.

The threshold for stating a claim for which relief can be granted is low: "To survive dismissal, the plaintiff must provide the grounds upon which her claim rests through factual allegations sufficient to raise a right to relief above the speculative level." _Reddington v. Staten Island Univ. Hosp._, 511 F.3d 126, 131 (2d Cir. 2007)

(citations and internal quotation marks omitted). In that regard, a complaint must contain "a short and plain statement of the grounds for the court's jurisdiction," as well as "a short and plain statement of the claim, showing that the pleader is entitled to relief." FRCP 8(a). Here, the Amended Complaint does not contain any allegations that would raise a claim against Oh, Hanley, Kickbush, or Kinsey above the speculative level. Moreover, Plaintiff's sworn affidavit negates the only factual allegation against Wilkins. Additionally, the Amended Complaint lacks any factual allegation linking Defendants to the change in his security classification. Furthermore, the deadline for amending the pleadings has long since passed.

A trial on these claims would waste Defendants' time and the Court's time. Accordingly, Plaintiff is directed to show cause why the security classification claim and the claims against Oh, Hanley, Kickbush, Kinsey and Wilkins, should not be dismissed.

CONCLUSION

Defendants' motion [#50] to amend their answers is denied. Defendants' motion for summary judgment [#52] is granted in part and denied in part. Summary judgment is granted as follows: The individual Defendants are granted summary judgment on the ADA claims; Berbary is granted summary judgment on all Section 1983 claims; Goord and Wright are granted partial-summary judgment on the Section 1983 claims seeking money damages; and all Defendants are granted summary judgment on the Eighth Amendment claims. Otherwise, summary judgment is denied.

**Further, Plaintiff is ordered to show cause, in writing, with evidentiary proof in admissible form, on or before October 23, 2009**, **why the security**

**classification claim and the claims against Oh, Hanley, Kickbush, Kinsey and**

**Wilkins, should not be dismissed.**

So Ordered.

Dated: Rochester, New York
        September 23, 2009

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge